HAMLIN, Justice.
 

 The Louisiana Public Service Commission (hereinafter referred to as the Commission) and the Town of Arcadia, intervenor, appeal from a judgment of the trial court in favor of the Louisiana Gas Service Company (hereinafter referred to as the Water Company), which directed the Commission to reinstate its Order No. 7921 dated August 20, 1959, and at the same time vacate and set aside its Orders Nos. 8157, 8545, and 8593, and further directed the Commission to immediately authorize the Water Company to place into effect the schedule of water rates in the Town of Arcadia which was submitted by the Water Company and approved by the Commission in its Order No. 7921.
 

 In his reasons for judgment, the trial judge has ably set forth, as follows, the events leading up to said judgment;
 

 
 *1036
 
 ' “On July 7, 1959, the town of Aricadla Board of Aldermen adopted a Resolution authorizing its Mayor to execute and file jointly with plaintiff (Louisiana Gas Service Company) an application to Louisiana Public Service Commission for an adjustment of water rates which would provide to plaintiff additional revenue of $28,500.00 per annum. * * * All of this was in . accordance with the proposed plan of the Board of Aldermen and a committee seeking new industry for Arcadia, and which would necessitate an expenditure of an estimated $116,000.00 by plaintiff for improvement and new facilities in the Arcadia water system.
 

 H
 
 * * *
 

 “This joint application was filed by plaintiff, Louisiana Gas Service Company and Board of Aldermen of town of Arcadia, with the Louisiana Public Service Commission July 16, 1959. A hearing was had in New Orleans August 15, 1959 before the Commission on the joint application of the Gas Company and the town of Arcadia. On August 20, 1959,. the Commission issued its Order No. 7921 approving the adjusted water rate hearing, conditioned on the Gas Company completing the proposed and agreed on improvements in the water system, which new rate was ‘ estimated to provide' additional revenue to the Gas Company of the agreed on and needed $28,500.00 annual revenue.
 

 “In accordance with said Order No. 7921, the Gas Company commenced the erection and construction of the new and improved water facilities, completing these improvements in February, 1960 at a cost of $116,000.00. On the completion of these improvements, the Gas Company put into effect the new water rate schedule which was estimated to produce an increase in revenue to the Gas Company of $28,-500.00 per annum. The new rate to go into effect about March 25, 1960.
 

 “A short while after these new rates became effective, it appears some of the citizens of Arcadia made complaints with the Commission, and the Commission held another hearing in Shreveport on May 19, 1960. All interested parties were permitted the opportunity of appearing at this hearing. After this hearing in Shreveport on May 19, 1960, the Commission issued Order No. 8157 on July 11, 1960 rearranging and altering the rate schedule approved in its Order No. 7921 by reducing the charges for water to private residences but requiring the Gas Company to charge for fire protection for industries and to the Town of Arcadia itself. In 'accordance with this order, the Gas-
 
 *1038
 
 Company filed a new rate schedule on July 29, 1960.
 

 “On August 8, 1960, the Town of Arcadia filed an application for a rehearing with the Commission complaining that this last rate schedule dated July 29, 1960 was in violation of the franchise from the Town of Arcadia to Louisiana Power & Light Company, predecessor to Louisiana Gas Service Company, dated October 28, 1958, further claiming that the Town of Arcadia should receive free water service.
 

 “On the same date this last application for a rehearing was filed, that is, August 8, 1960, the Commission notified the Gas Company that paragraph 3 of its Order No. 8157 was suspended. This paragraph 3, before it was suspended by the Commission, permitted the Gas Company to make appropriate charges for fire protection for industry and the Town of Arcadia. * * * The Gas Company filed an opposition to the application of the Town of Arcadia for a rehearing.
 

 “No further action was taken by the . Commission until September 13, 1961 ,,at which time the Commission held a hearing in Shreveport. Subsequent to this hearing the Commission issued its Order No. 8545, providing for the same rate schedule for'residential customers as did Order No. 8157, but restricting privately owned industry from paying any additional revenue and further providing for free water service for fire protection to the Town of Arcadia.
 

 “On December 5, 1961, Order No. 8593 was issued by the Commission suspending fire protection rates provided in Order No. 8545 and further reducing plaintiff’s needed additional annual revenue.”
 

 On November 20, 1961, the Water Company filed the present suit, praying in substance for the relief granted it by the trial court, supra. The Commission, and the Town of Arcadia which had intervened in the matter, prayed for rejection of plaintiff’s demands. The trial court overruled the Water Company’s objection to the introduction of additional evidence by the Commission and the Town of Arcadia. This Court denied writs on May 18, 1962. The case was then heard by the district court, which remanded the entire record back’Jo the Commission for review in light of the, additional testimony taken' at the hearing., Finding nothing new in the additional testi-mony to influence its previous decision, the Commission reaffirmed its former ruling. The matter then went back to the trial court for final determination, and the judgment submitted for our review on this appeal ensued.
 

 In the Specification of Errors set forth in their joint brief, the Commission and the
 
 *1040
 
 Town of Arcadia contend that the district court erred in the following respects:
 

 “I.
 

 “In substituting its judgment for that of the Commission when the judgment of the Commission is not arbitrary nor capricious nor contrary to the evidence, and no error of law has been committed.
 

 “II.
 

 “In failing to take into account the impact of the proposed rate from the standpoint of the Consumer.
 

 “III.
 

 “In failing to hold that the proponent for a proposed rate increase has the burden of proof and in failing to require such proponent to explain the reason for unusually high operating costs.”
 

 Appellants pray that the judgment of the district court be reversed and that the final order of the Commission be reinstated. They argue:
 

 “Louisiana Gas Service Company made no attempt in this proceeding to explain the reason for its high operating cost, but to the contrary, made the assumption that they were entitled to charge the highest rates in the State of Louisiana, merely because their operating costs were unusually high. The Company was the proponent in this proceeding and it was incumbent upon it to prove to the satisfaction of the Commission the necessity for its proposed rate. We submit that it did not sustain the burden of proof required of it, merely by proof of unusually high operating costs, without an adequate explanation for the reason for those costs.”
 

 Appellee argues (a) that Orders Nos. 8157, 8545, and 8593 of the Commission are confiscatory; (b) that the acts of the Town of Arcadia constitute an impairment of the obligation of contract; and (c) that Orders Nos. 8157, 8545, and 8593 constitute an unjust enrichment to the Town of Arcadia.
 

 A gist of the testimony of record taken at the hearings in Shreveport on May 19, 1960 and September 13, 1961, and before the trial court on September 27, 1962, substantially reflects that on December 13, 1949, Community Public Service Company conveyed to Louisiana Power and Light Company, among other properties, the electric and water franchise for the Town of Arcadia. In compliance with a divestment order of the Securities Exchange Commission,
 
 [1]
 
 Louisiana Power and Light Company divested itself of non-electric properties in Louisiana by transferring certain fran
 
 *1042
 
 chises to Louisiana Gas Service Corporation, a subsidiary; among the franchises transferred was the water franchise for the Town of Arcadia, which plaintiff purchased on September 30, 1958, for a consideration of between $365,000.00 and $400,-000.00. The Town of Arcadia is the only location in Louisiana in which plaintiff operates a water distribution system.
 

 During April, 1959, the Town of Arcadia (population, approximately 2,500) and its development commission composed of a sixteen member board of directors and approximately one hundred and fifty members became interested in attracting new industry. At the same time, Cook and Company, a manufacturing enterprise, was interested in locating in Arcadia. A. B. Paterson, Vice-President in charge of operations of the Water Company (independence from the parent company is now complete), was contracted by officials of the Town of Arcadia, and a meeting of the town officials and representatives of Cook and Company' was held with representatives of the Water Company on April 14, 1959. The Water Company had a capacity of 50,000 gallons overhead to supply water to the Town of Arcadia, and it was determined at the meeting that the Water Company’s installations were insufficient to meet the new industry’s requirements. The Water Company stated that it could not expand unless increased water rates were granted to it. The following testimony of Paterson is pertinent to the events which transpired after this first meeting:
 

 “ * * * At this second meeting Mr. York got up and stated that Cook and Company would not put in the overhead storage tank which we had talked about previously, and that we would have to put that tank in for them and supply the 100,000 gallons of overhead water, plus the 1200 gallons per minute at 30 pounds pressure. ' And we had made some preliminary studies on this and realized that it was quite an involved job, because to handle that amount of water it takes something on the order of a 10-inch pipe which gets into quite a large pipe-size and, of course, a 100,000 gallon tank gets into quite a bit of money. So, as the Mayor testified, we talked about the thing and Mr. York of Cook and Company first recommended increased rates, and the Town Council said that they would agree to increased rates and asked us how much it would take, and we told them that we were not in a position to tell them until we had some engineering studies and found out how much money we were talking about spending and had a chance to make some studies of the matter. But we came to an agreement that we would go ahead and make the studies if they would give us some increased rates which we, of course, did.
 

 
 *1044
 
 “Now, following this agreement where we agreed to make the studies .* * * The Mayor also asked us, in making these changes, to try to design them in such a way that the Town would get the maximum benefit from whatever changes we made and try to build something into the system ■ that would improve the fire protection for the rest of the Town as well as Cook and Company.
 

 “So, with that in mind, we went to the Fire Prevention and Rating Bureau and talked to Mr. Hottinger and his .recommendation was that we put 250,-■:0p0 gallons of water overhead in the tank to supply the fire protection for that size town. Well, that kind of shook us; we thought 100,000 was pretty rough but his recommendations came out to be the 250,000, and after going into the matter quite thoroughly with our engineers we decided that that would be the best thing to do for the overall picture of improving of the system in the Town.”
 
 [2]
 

 Thereafter, on July 7, 1959, the Board of Aldermen of the Town of Arcadia passed a Resolution, which set forth in detail the facts surrounding the proposals for expansion by the Water Company and concluded as follows:
 

 “NOW, THEREFORE, the Board of Aldermen of the Town of Arcadia, in lawful session convened, does hereby authorize, empower and direct the Mayor of the Town of Arcadia for and on behalf of the Town of Arcadia to execute and file jointly with Louisiana Gas Service Company a petition or application to the Louisiana Public Service Commission for an adjustment of the water rates of Louisiana Gas Service Company to provide additional revenues from the sale of water to customers in and near the Town of Arcadia sufficient to provide additional revenues of $28,500.00 per annum and for that purpose to adjust the present water rate schedule of Louisiana Gas Service Company to the water rate schedule shown on Exhibit ‘A’ attached hereto and made a part hereof; to appear and participate in any proceedings before the Louisiana Public Service Commission upon such petition or application or upon any petition or application by Louisiana Gas Service Company for an adjustment of its water rates as aforesaid and to approve, consent to, support, favor and urge
 
 *1046
 
 the adjustment of said water rates as aforesaid; provided that the said petition or application is conditioned upon said adjustment in rates becoming effective only on and after the date of completion of construction of an elevated storage tank facility and necessary water mains, valves, and appurtenances for use by and protection of the plant of Cook & Company and also for use by the citizens of the Town of Arcadia for protection from the hazards of fire.”
 

 On August 20, 1959, the Commission issued Order No. 7921. No opposition had been offered with respect to the increased rates granted to the Water Company in said Order, and the Commission had followed its customary procedure of notifying all the news media available to Arcadia “to try to get word to everyone of what was going on”; the media included the town paper, the Ruston paper, the Shreveport papers, the radio stations, the T.V. stations, officials, police jurors, and legislators. Order No. 7921 recites in part:
 

 “The proceeding herein is a proposal by Louisiana Gas Service Company to increase its rates for water service.in the Town of Arcadia, Louisiana, to the following:
 

 “Net monthly bill:
 

 “First 2,000 gallons $3.65 minimum
 

 “Next 8,000 gallons
 
 .85‡
 
 per 1,000
 

 “Next 10,000 gallons , ,55¡é per 1,000
 

 “All additional .40^ per 1,000
 

 “ * * *
 

 “Testimony adduced at the hearing indicated that the water operations for the year 1958 resulted in a net loss and that after the proposed rate increase, the estimated profit would be approximately $750.00 before interest and other charges against net operating income. The accounting staff of the Commission reported that the company’s records support these allegations.
 

 “Having considered all the testimony and the facts of this case, it is the opinion of the Commission that the public interest would be served by authorizing the proposed rates contingent upon the carrying out of the proposed new construction by the applicant herein.
 

 “IT IS ACCORDINGLY OR.DERED, that upon completion of the installation of the proposed new overhead water tank and the installation of the 10" mains as set forth in Exhibit III attached to applicant’s petition, the foregoing rates for water service in the Town of Arcadia, Louisiana, be and they hereby are approved, * * ”
 

 The Water Company paid $1,868.18 for a parcel of land needed for the project and paid $61,740.11 to contractors for modifi
 
 *1048
 
 cations at the plant and for additional piping put in for getting water to the tank and from the tank to the manufacturing plant; total expenditures amounted to $115,995.00, or a rounded figure of $116,-000.00. The work was completed about the middle of February, 1960, and the new increased rates went into effect on bills rendered on and after March 26, 1960. The record reflects that in many instances the increased rates had the effect of approximately doubling the bills previously paid by consumers.
 

 Cook and Company employed between seventy-five and eighty persons and began its operations of making the wood portion of truck bodies.
 

 Many of the events described by the trial judge and quoted supra transpired after March, 1960.
 

 Under the final orders of the Commission, the Water Company stated that it was suffering an annual loss of $13,500.00, and we find no contradictory evidence with respect to the following testimony of Paterson adduced before the trial court:
 

 “Q. The Commission issued what Order?
 

 “A. Order No. 8593.
 

 “Q. And what was the effect of that Order, Mr. Paterson ?
 

 “A. The effect of that Order was to suspend the charges for fire protection to industries, and it further reduced our revenue by some $4,000.00.
 

 “Q. Then assuming that Order No. 8593, along with the preceding Orders 8545 and 8157, had been left in effect what annual loss would the company suffer?
 

 “A. The company would suffer an annual loss of $13,500.00.
 

 “Q. Then since December 5, 1961, is it correct that you have been operating under schedules filed pursuant to Order No. 8593?
 

 “A. That’s correct.
 

 “Q. And you have been suffering a loss which annualized would be $13,500 a year, is that right?
 

 “A.
 
 That’s correct.”
 

 When questioned with respect to the increased fire protection for the Town of Arcadia, Paterson replied:
 

 “Yes, that was the reason we went into the arrangement we did and put in a 200,000 gallon tank instead of a 100,000. We could have gotten by for less money if we had just gone out to Cook and Company and put up a 100,-000 gallon overhead storage tank. But the reason we put in a 200,000 gallons and these lines was to afford the town better fire protection.”
 

 
 *1050
 
 Mr. Paterson stated that the townspeople, as well as the new industry, received a benefit from the new facilities constructed
 

 E. H. Owens, a consulting engineer who appeared as an expert on behalf of the Commission and the intervenor in the trial court, testified that from an analysis he made he found that the operational costs of the Water Company were high, and that its rates were likewise high. He said, however, “I don’t think it’s incumbent on me as a witness to testify to whether or not management can cut operating expenses. I have made no effort to go into the operating expenses to see if they can be decreased.” Owens further stated that his analysis was not entirely complete. He did not know the size of the largest water lines in the systems analyzed; he was not acquainted with fire flow measurements; he did not know deficiency points nor hydrant spacing in the towns analyzed; he did not know the age of all of the systems analyzed; he did not know about the overhead storage facilities in a number of the towns whose systems were analyzed; he did not know about the quality of the water in all of the systems; he did not know the facts as to fire hydrant charges in all of the towns analyzed. In other words, Owens did not point out specific deficiencies in the Water Company’s water distribution system, nor did he offer testimony as to methods whereby the rates of the Water Company could be lowered and the $13,500.00 annual loss eliminated.
 
 [3]
 

 Arthur A. DeFraites, a consulting engineer, testified in the trial court on behalf of the Water Company. He said that considered as a whole the water rates in Arcadia were high; he qualified his statement by postulating that all rates are strictly relative, “but in considering whether or not a rate is high, all the other factors must be taken into consideration, when the system was built, the recent improvements that were put in, the quality of water and the size of the main’s adequacy for fire protection, there are so many different factors that unless a particular operation were carefully studied to determine where economies could be made then you could reach no conclusion.”
 

 Since the present suit is not in a real sense a rate case, we do not find it necessary to treat the complicated and involved interpretation and application of the law dealing with rate fixing. The issue of rates is an indirect one; the rates which can be charged by the Water Company result only from a determination of other matters. Here, wé are concerned with a contractual obligation, and a determination must be made as to whether such obligation was impaired, and if so whether it could have been impaired.
 

 
 *1052
 
 , A contract is an agreement by which one person obligates himself to another to do or permit, or not to do something, expressed or implied by such agreement. LSA-C.C., Art. 1761. The validity of a contract depends upon four requisites: (1) the parties must be legally capable of contracting, (2) the consent of the parties must be legally given, (3) there must be a certain object, which forms the matter of agreement, and (4) the purpose must be lawful. LSA-C.C., Art. 1779. “Agreements legally entered into have the effect of laws on those who have formed them. They can not be revoked, unless by mutual consent of the parties, or for causes acknowledged by law. They must be performed with good faith.” LSA-C.C., Aft. 1901.
 

 “The obligation of a contract is that which the law in force when the contract is made obliges the parties to do or not to do; the remedy, the legal means to carry it into effect. A subsequent law, which exempts all, or even part, of the debtor’s property from execution, would therefore be unconstitutional. Likewise a subsequent law which would exempt a part of the debtor’s obligation to do or to pay is unconstitutional. * * * ” Harris v. Monroe Building & Loan Ass’n, La.App., 154 So. 503; 185 La. 289, 169 So. 343. See, Ogden v. Saunders, 12 Wheat.
 
 213,
 
 25 U.S. 213, 6 L.Ed. 606.
 

 “No ex-post facto law, nor any law impairing the obligation of contracts, shall be passed; nor shall vested rights be divested, unless for purposes of public utility, and for just and adequate compensation previously paid.” LSA— Const, of 1921, Art. IV, Sec. 15.
 

 “A state law divesting vested rights violates no constitutional provision where it does not impair the obligation of a contract; it is only when legislation acts upon contracts, as distinct from vested rights, that the prohibition against impairment of the obligation is infringed. * * * ” State ex. rel Porterie v. Walmsley, 183 La. 139, 162 So. 826; Bd. of Liquidation v. Bd. of Com’rs of Port of New Orleans, 296 U.S. 540, 56 S.Ct. 141, 80 L.Ed. 384.
 

 “The Commission shall have and exercise all necessary power and authority to supervise, govern, regulate and control all * * * water works, * * and other public utilities in the State of Louisiana, and to fix reasonable and just single and joint line rates, * * for the commodities furnished, or services rendered by such * * * public utilities, except as herein otherwise provided.” LSA-Const. of 1921, Art. VI, Sec. 4.
 

 “It is conceded on well-recognized authority that the rate-making power; whether exercised by agree
 
 *1054
 
 ment or by the fiat of law, is within the police power of the state as one of the state’s highest attributes of sovereignty, and that his power can never be abridged nor irrevocably surrendered where there is, as in this state, constitutional inhibition. * * * ” Baton Rouge Waterworks Co. v. Louisiana Pub. Serv. Comm., 156 La. 539, 100 So. 710. Cf. Sweet v. Wilkinson, 252 Ala. 343, 40 So.2d 427.
 

 “The orders of the Commission fixing or establishing any rate * * * for any commodity furnished, service rendered * * * by any * * * public utility * *
 
 *
 
 shall go into effect at such time as may be fixed by the Commission, and shall remain in effect and be complied with, unless and until set aside by the Commission, or by a final judgment of a court of competent jurisdiction, * * LSAConst. of 1921, Art. VI, Sec. 5.
 

 “In this state that legislative, or quasi legislative, function has been vested by the Constitution in the Railroad Commission (now the Public Service Commission); and whatever jurisdiction the courts have over the subject-matter is only because of the authority vested in them to review the orders of said Commission.” Vicksburg, S. & P. Ry. Co. v. Railroad Commission of Louisiana, 153 La. 983, 96 So. 832. ‘
 

 “ * * * Though the obligations of contracts must yield to a proper exercise of the police power, and vested rights cannot inhibit the proper exertion of the power, it must be exercised for an end which is in fact public and the means adopted must be reasonably adapted to the accomplishment of that end and must not be arbitrary or oppressive.” Treigle v. Acme Homestead Ass’n, 297 U.S. 189, 56 S.Ct. 408, 80 L.Ed. 575.
 

 Guided by the above law and jurisprudence, we approach a discussion of the instant contract. As stated supra, the Town of Arcadia wanted Cook and Company tc> locate in Arcadia; the location' became an established fact. Cook and Company had to have water distribution facilities, and representatives of the Town of Arcadia approached the Water Company with respect to furnishing such facilities'. The Water Company required $28,500.00 additional revenue per annum in order to accede to the demands of the Town of Arcadia for water distribution expansion; this expansion was accomplished, supra, at a cost of $116,000.00. The Town of Arcadia, acting through its Board of Aldermen (no contention is made that this body was not legally constituted), passed a Resolution, supra, authorizing the Mayor to join with the Water Company in
 
 *1056
 
 petitioning the Commission for higher rates sufficient to provide the additional revenue. The action directed in the Resolution took place, and Order No. 7921, supra, ensued; the Commission stated that the public interest would be served by authorizing the increased rates.
 

 We find that the Water Company and the Town of Arcadia contracted; both parties agreed to do something; both parties performed. The parties were capable of contracting; they gave their legal consent; the cause was lawful. We conclude that when the Water Company completed the new facilities and the increased rates went into effect, the contract was complete. The Town of Arcadia should not now be heard to urge the matter of reduced rates, as such action is contrary to its contractual obligation. Shreveport Traction Co. v. City of Shreveport, 122 La. 1, 47 So. 40.
 

 'The contract between the Water Company and the Town of Arcadia had the effect of law between the parties. Cf. Waterworks District No. 3 v. City of Alexandria, 236 La. 804, 109 So.2d 426; City of Shreveport v. Southwestern Gas & Electric Co., 151 La. 864, 92 So. 365. It could not be revoked unless by mutual consent, or for causes acknowledged by law; it had to be performed with good faith.
 

 In Specification of Errors II, supra, appellants allege that the district court erred in failing to take into account the impact of the proposed rate from the standpoint of the consumer. Some citizens of the Town of Arcadia applied to the Commission for lower water rates after Order No. 7291, supra, was issued. They might have been in an unfortunate position, but the obligations imposed upon them by the actions of their Board of Aldermen were legally imposed. A review of the testimony, supra, shows that the citizens of the Town of Arcadia were not subjected to undue hardship by reason of the increased rates; in fact, many of them actually derived benefits from the increased water facilities without increased taxation.
 
 [4]
 
 We find no merit in appellants’ contention.
 

 We are cognizant that under its powers which we have quoted supra, the Commission was not inhibited from acting in the public interest; it was not bound by the contract between the Water Company and the Town of Arcadia. However, the Commission’s action in reducing the water rates to be paid by the citizens of the Town of Arcadia — provoked at the instance of some citizens — and causing the violation of the obligation of contract was unreasonable and is subject to reversal. Texas & N. O. R. Co. v. Louisiana Public Service Comm., 235 La. 973, 106 So.2d 438 Southern Bell
 
 *1058
 
 Tel. & Tel. Co. v. Louisiana Public Service Comm., 239 La. 175, 118 So.2d 372.
 

 When the Town of Arcadia applied to the Commission for a rehearing, supra, the franchise had already been violated by the Commission’s Order No. 8157, issued subsequent to its Order No. 7921.
 

 The final order of the Commission, No. 8593 supra, had the effect of bringing about an annual loss of $13,500.00 to the Water Company; as stated supra, this fact is uncontradicted. The Water Company was precluded from securing the minimum $28,500.00 additional revenue required after it had expended and parted with $116,000.00 for expansion. We find that the final action of the Commission was unreasonable and arbitrary and constituted an abuse of power subject to reversal by the court. Railway Express Agency v. Louisiana Public Service Comm., 243 La. 518, 145 So.2d 18. Cf. United Gas Pipe Line Co. v. Louisiana Public Service Comm., 241 La. 687, 130 So.2d 652.
 

 In Specification of Errors III, supra, appellants argue in substance that plaintiff did not bear the burden of proof required of it. The evidence summarized supra definitely discloses that the Water Company has borne its burden of proof; it proved the contract which existed between it and the Town of Arcadia, and it proved the violation of the contract by the latter party; it proved that it was operating at an annual loss of $13,500.00 under the last order of the Commission; it also proved that it required $28,500.00 annual additional revenue because of expanded facilities paid for by it. No evidence was offered by the intervenor or by any opponent of the Water Company to show that the evidence adduced by the Water Company was untrue or that it was not operating efficiently. There is no merit in the contention.
 

 In Specification of Errors I, supra, appellants urge that the last order of the Commission was not arbitrary nor capricious nor contrary to the evidence. Under the facts of the case, we find that the conclusions and findings of the trial judge are correct; he committed no error in substituting his judgment for that of the Commission.
 

 For the reasons assigned, the judgment of the trial court is affirmed.
 

 SANDERS, J., concurs in the result.
 

 [1]
 

 . See, Securities & Exchange Comm. v. Louisiana Public Service Comm., 353 U.S. 368, 77 S.Ct. 855,1 L.Ed.2d 897.
 

 [2]
 

 . By written agreement, Louisiana Power g.nd Light Company had consented to ' furnish free \vater for many town services of the Town of Arcadia which includes its citizens. Fire hydrants and a swimming ■, pool were among the services to which free water was distributed. Plaintiff continued the agreement of its original parent company.
 

 [3]
 

 . Owens’ testimony was highly efficient, but it was not pin-pointed to the Arcadia water distribution system. '
 

 [4]
 

 . See, Footnote 2, supra.